IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Wayne J. Dunagan, ) | Civil Action No. 6:10-1846-RBH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on January 30, 2006, alleging that he became unable to work on June 1, 2003. The application was denied initially and on reconsideration by the Social Security Administration. On December 19, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and an impartial vocational expert appeared on March 3, 2009, considered the case *de novo*, and on July 6, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on May 26, 2010.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since June 1, 2003, the alleged onset date (20 C.F.R. § 1571, *et seq.*)
>
> 3.  The claimant has the following severe impairment: osteoarthritis (20 C.F.R. § 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c).
>
> 6. The claimant is capable of performing past relevant work as a pastor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565)
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2003, through the date of this decision (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

Prior to the plaintiff's alleged onset date, Andy Hester, M.D., treated him for, among other things, shoulder pain, arthritis, and shortness of breath (*see, e.g.*, Tr. 247, 265). The plaintiff was also evaluated by David Schwartz, M.D., of Duke University Hospital for asbestos-related lung disease. The plaintiff complained of shortness of breath, cough, and phlegm production, and a chest x-ray demonstrated bilateral interstitial lung disease and bilateral pleural and diaphragmatic plaques. However, his pulmonary function tests were normal (Tr. 245).

In August 2003, the plaintiff presented to Greenville Memorial Hospital with sharp left flank pain. On examination, he was mildly distended and diffusely tender. He was diagnosed with low back pain. In February 2004, the plaintiff presented to Pulmonary and Critical Care and Sleep Associates. Ravi Chandran, M.D., reported that the plaintiff's spirometry, lung volumes, and diffusion capacity were all within normal limits (Tr. 282-284, 286).

Dr. Hester continued to treat the plaintiff from September 2003 through February 2006. Dr. Hester assessed shoulder and knee pain, osteoarthritis, and asbestosis, among other things (Tr. 299-317). In October 2005, the doctor completed a "Questionnaire Concerning Wayne Dunagan." In response to the question, "can Wayne Dunagan engage in anything more than SEDENTARY work," Dr. Hester responded "yes." In response to the question, "can Wayne Dunagan engage in anything more than LIGHT work," Dr. Hester responded "no." Dr. Hester opined that the plaintiff was limited by osteoarthritis and he premised his opinion on his physical exam, the plaintiff's complaints of pain, and the plaintiff's limited function of joints (Tr. 539).

In April 2006, the plaintiff was admitted to Greenville Hospital with atypical chest complaints. He underwent a heart catheterization, which was normal. He was also

5

treated by neurology because of headache complaints, which improved after admission. He was discharged six days later in "very stable condition" (Tr. 372).

Later in April 2006, Melvin Porter, M.D., examined the plaintiff at the request of the state agency. The plaintiff primarily complained about asbestosis, which he alleged caused him to be exhausted after two or three hours of exertion, but also complained about arthritis in his elbows, shoulders, knees, and back, and frontal headaches. Upon examination, he was ambulatory without assistance, and Dr. Porter noted no abnormal noises on evaluation of both lungs. None of the plaintiff's joints were tender, although he had slightly reduced range of motion of his fingers and swelling in his knuckles. Dr. Porter noted that the plaintiff's physical appearance and hygiene suggested a lack of interest in his personal appearance. He also had no muscle atrophy or weakness in either his upper or lower extremities but had decreased range of motion in his left shoulder when raising his arm overhead. Dr. Porter's assessment was pulmonary asbestosis "by history, but normal examination of his lungs today and normal pulmonary function testing on October 6, 2005," osteoarthritis of his hand and probably of his left shoulder, and frontal headaches, "cause uncertain" (Tr. 401-403).

In November 2006, the plaintiff sought treatment from Daniel Caddell, M.D., complaining of numbness in his left thigh radiating down to the bottom of his big toe and pain in his left hip. Examination revealed that the plaintiff was tender in his low back, and he had a stiff and tender left knee. Dr. Caddell diagnosed back pain, sciatica, left knee pain and stiffness, and osteoarthritis (Tr. 446). The plaintiff continued to receive treatment from Dr. Caddell over the next nine months (*see* Tr. 445-46, 450-54). On August 28, 2007, Dr. Caddell completed a "Questionnaire Concerning Wayne Dunagan," in which he opined that the plaintiff's headaches and shortness of breath limited his work capacity. He indicated that the plaintiff's diagnoses of septal deviation, turbinate on right paradoxical, and chronic headaches all support his assessment of the plaintiff's abilities (Tr. 449). On that same

date, Dr. Caddell saw the plaintiff for complaints of headaches "all the time." Dr. Caddell noted the plaintiff was in moderate distress. He diagnosed the plaintiff with chronic headaches, turbinate obstruction and abnormality on the right, osteoarthritis, sinusitis, dyspnea, and asbestosis. He prescribed medication and instructed the plaintiff to follow up (Tr. 450). Dr. Caddell saw the plaintiff an additional three times in 2008 (Tr. 489-90, 535).

The plaintiff was seen in the emergency room of St. Francis Hospital on February 22, 2007. He reported feeling "swing headed" and having a headache for the previous two months (Tr. 469). He was diagnosed with vertigo and chronic sinusitis (Tr. 471). The plaintiff was in the emergency room of St. Francis again on March 3, 2007 with complaints of dizziness, weakness, fatigue, soreness in his chest, and a constant headache. He was diagnosed with sinusitis and discharged (Tr. 466). On September 18, 2007, the plaintiff was seen in the emergency room of St. Francis Hospital with complaints of shortness of breath and chest pain. He was diagnosed with anxiety and discharged (Tr. 455-56).

In February 2008, the plaintiff began receiving treatment from Nancy St. John, D.C., a chiropractor. The plaintiff complained of headaches and neck, upper back, and arm/shoulder pain (Tr. 577-78). The plaintiff regularly saw Dr. St. John through September 2008 (Tr. 542-76). In September 2008, Dr. St. John completed a "Questionnaire Concerning Wayne Dunagan" in which she opined that the plaintiff could not perform more than sedentary work (Tr. 536). She diagnosed shoulder segmental dysfunction, shoulder injury, shoulder pain, and shoulder radiculitis  She premised her opinion on decreased range of motion, pain—constant ache and sharp pain with motion—and edema and muscle spasm in the shoulder joint (Tr. 436).

In June 2008, the plaintiff presented to James Pittman, M.D., for a new patient evaluation. The plaintiff reported that he was a diabetic and had a number of other symptoms "including most bothersome is extreme loss of energy." The doctor ordered lab

7

tests (Tr. 527). The plaintiff followed up a week later, reporting that he was mildly diabetic and had "some" back and joint pain. Dr. Pittman noted that all the plaintiff's lab tests were normal (Tr. 522). In August 2008, the plaintiff reported that he had been to the emergency room with pain in his neck, thoracic spine, and shoulders, but Dr. Pittman noted that his x-rays were normal (Tr. 521, *see* Tr. 491-506). Dr. Pittman "injected the triceps tendon insertion in both shoulders with lidocaine and Kenalog" (Tr. 521). Finally, in September 2008, Dr. Pittman opined that the plaintiff could not perform more than sedentary work because of back pain and neck pain secondary to osteoarthritis. His opinion was premised on an "orthopedic consultant" at Steadman-Hawkins (Tr. 537).

The plaintiff testified at the hearing that he had worked as an insulator for 40 years and quit because he was unable to do the work. He testified that since he quit his past job, he continued to work as preacher (Tr. 65, 67). The plaintiff alleged that he could not work because he had continuous headaches and arthritis. He also alleged that he had asbestosis, which affected his ability to breathe (Tr. 76-78).

The plaintiff testified that he could walk well as long as he did not have to walk up hills, steps, or stairs, and estimated he could walk for 30 minutes at a time. He further testified that he could stand at least 15 minutes at a time and sit for 30 minutes at a time before he got stiff or sore. He said that he could probably lift 30 pounds, and he has to use both arms to put a gallon of milk in the refrigerator (Tr. 79-80).

A vocational expert also testified at the administrative hearing , responding to the ALJ's hypothetical that such a person could perform the plaintiff's past work as a pastor (*see* Tr. 84-88).

## **ANALYSIS**

The plaintiff was 57 years old on his alleged disability onset date and 63 years old at the time of the ALJ's decision. He alleges disability commencing June 1, 2003. The ALJ found that the plaintiff had the RFC to perform a full range of medium work and further

found the plaintiff could perform his past relevant work as a pastor (Tr. 18-20, 30-32).[2] The plaintiff argues that the ALJ erred by (1) failing to properly evaluate the opinions of his treating physicians; (2) determining that he could perform his past relevant work; and (3) failing to establish other work that he could perform.

***Treating Physicians***

The plaintiff first argues that the ALJ failed to properly consider the opinions of his treating physicians, several of whom opined that he could only perform light or sedentary work. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[2]The ALJ issued two decisions, one dated July 1, 2009, and the other dated July 6, 2009 (Tr. 13-21; 25-33). The notice accompanying the *earlier* decision states that it is an "amended decision" (Tr. 10). In the July 1st decision, the ALJ stated the plaintiff met the insured status requirements of the Social Security Act through June 30, 2011 (Tr. 15). In the July 6th decision, the ALJ stated the plaintiff met the insured status requirements of the Social Security Act through September 30, 2010 (Tr. 27). This is the only difference in the two decisions that the court has been able to ascertain. This court finds that the decision should be remanded for the reasons discussed herein. Accordingly, upon remand, the ALJ should also be instructed to clarify the finding as to the dates of the plaintiff's insured status.

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

In October 2005, Dr. Hester, a treating physician, completed a "Questionnaire Concerning Wayne Dunagan."  In response to the question, "can Wayne Dunagan engage in anything more than SEDENTARY work," Dr. Hester responded "yes."  In response to the question, "can Wayne Dunagan engage in anything more than LIGHT work," Dr. Hester responded "no."  Dr. Hester opined that the plaintiff was limited by osteoarthritis, and he premised his opinion on his physical exam, the plaintiff's complaints of pain, and the plaintiff's limited function of joints (Tr. 539).

On August 28, 2007, Dr. Caddell, a treating physician, completed a "Questionnaire Concerning Wayne Dunagan," in which he opined that the plaintiff's headaches and shortness of breath limited his work capacity.  He indicated that the plaintiff's diagnoses of septal deviation, turbinate on right paradoxical, and chronic headaches all support his assessment of the plaintiff's abilities (Tr. 449).

In September 2008, Dr. Pittman, also a treating physician, opined that the plaintiff could not perform more than sedentary work because of back pain and neck pain

secondary to osteoarthritis. His opinion was premised on an "orthopedic consultant" at Steadman-Hawkins (Tr. 537).

Also in September 2008, Dr. St. John, a treating chiropractor, completed a "Questionnaire Concerning Wayne Dunagan" in which she opined that the plaintiff could not perform more than sedentary work (Tr. 536). She diagnosed shoulder segmental dysfunction, shoulder injury, shoulder pain, and shoulder radiculitis  She premised her opinion on decreased range of motion, pain—constant ache and sharp pain with motion—and edema and muscle spasm in the shoulder joint (Tr. 436).

> The ALJ found as follows:
>
> I do not find these opinions credible with regard to the claimant's ability to do work related activities. The conclusions are inconsistent with the MRIs taken in January 2009 and are not supported by objective medical findings or each doctor's own treating progress notes of record. Specifically, as noted above, the claimant demonstrated normal range of motion, normal reflexes, no cranial nerve deficit, normal coordination, normal mood and affect, and normal behavior (Exhibit 33F). Further, the claimant denied weakness, tingling, dizziness, visual changes, nausea and vomiting (Exhibit 33F). By his own admission, the claimant is able to lift 30 pounds. Further, the claimant testified he is able to walk well at a normal pace on any elevation. Thus, the above-referenced conclusions are tenuous and not supported by current, objective findings. Additionally, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Accordingly, I do not accept Drs. Caddell, St. John, and Hester's conclusions with regard to the claimant's residual functional capacity (SSR 96-6p).
>
> Further, I give little weight to the opinion of James Pittman, M.D. (Exhibit 29F). Dr. Pittman is an internist who treated the

11

>claimant for mild diabetes. Dr. Pittman determined the claimant could not perform sedentary work, but based his opinion on another physician's observations. Dr. Pittman is accorded little weight because his opinion appears to rest, at least in part, on an assessment of an impairment outside his area of expertise.

(Tr. 19, 31).

The ALJ cites to inconsistency between the physicians' opinions and the "MRIs taken in January 2009." However, as noted by the plaintiff, he has not had an MRI. The plaintiff has had numerous CT scans but cannot have an MRI due to a metal particulate embedded in the skin on his head (Tr. 84, 343, 345, 462). Further, the ALJ did not consider the length of treatment and frequency of treatment with these treating physicians. Dr. Hester treated the plaintiff for over six years (Tr. 247-80, 290-334; 339), and Dr. St. John treated the plaintiff sometimes more than twice a week (Tr. 573-78; 581-87). Also, Dr. Caddell treated the plaintiff for at least a couple of years (Tr. 444-46, 449-54, 489-90, 534-35).

The ALJ also discounted the opinions based upon the plaintiff's statements at the hearing that he could "walk well at a normal pace at any elevation" and could "lift 30 pounds" (Tr. 19, 31). However, as pointed out by the plaintiff, the actual testimony was a bit different:

>Q: Sir, how far would you say you could walk now before you had to sit down?
>
>A: As far as just a steady walk?
>
>Q: Yeah.
>
>A: You know, a normal walk, I can walk good as far as that. If I got in a hurry or hills or steps, stairs or anything –
>
>Q: Well, just normal walk, how many minutes would you say you could walk? Could you walk an hour?
>
>A: Probably, maybe 30 minutes….But if there's any strain like elevation or anything …. It gets me quick.

> \*\*\*
>
> Q: How much would you say you could lift?
>
> A: Probably 30 pounds. I'd like to say I have to, I have to use my other arm to help me put a gallon of milk up in the refrigerator. I know that a lot because I have to do it.

(Tr. 79-80).

Furthermore, the Commissioner relies on *post hoc* rationale in arguing that the weight given to the physicians' opinions is appropriate. The Commissioner argues that the ALJ "reasonably discounted the opinion of Dr. St. John — a chiropractor who is not an acceptable medical source and thus cannot be a treating physician — who also offered an opinion on a matter reserved to the Commissioner" (def. brief at 7). The Commissioner further argues that the opinions of Drs. St. John and Pittman were properly rejected because the opinions were on an issue reserved by the Commissioner (def. brief at 8, 10), However, these factors were not cited by the ALJ to discount the opinions and are thus *post hoc* rationale. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Moreover, the ALJ found that the doctors' treatment notes did not support their opinions, but he did not cite the treatment notes he found to be inconsistent. The only evidence cited by the ALJ in his finding is exhibit 33F (Tr. 19, 31; *see* Tr. 590-604), which contains the records from the plaintiff's CT scan of his shoulder on August 5, 2008, which revealed degenerative changes but no acute abnormality (Tr. 604), and from the plaintiff's treatment for a severe headache in the emergency room on January 6, 2009 (Tr. 590-603). These treatment notes from two days of treatment do not constitute substantial evidence upon which the ALJ should be able to discount the opinions of four treating sources.

13

Accordingly, upon remand, the ALJ should be instructed to weigh the opinions of Drs. Hester, Caddell, Pittman, and St. John in accordance with the foregoing.

## Past Relevant Work

The plaintiff next argues that the ALJ erred in the analysis of whether he could perform his past relevant work. Specifically, the ALJ made conflicting findings with regard to the plaintiff's work as a pastor. At step one of the sequential evaluation, the ALJ stated, "The claimant has not engaged in substantial gainful activity since June 1, 2003, the alleged onset date" (Tr. 15, 27). He went on to find:

> Based on the Regulations, I find the claimant's work as a pastor was substantial gainful activity. However, I find the amount of expenses the claimant incurred brought the overall income under the level of substantial gainful activity. Although the claimant worked after the alleged disability onset date, the work activity did not rise to the level of substantial gainful activity….
>
> I find substantial gainful activity is not at issue in this decision.

(Tr. 16, 28). At step four of the sequential evaluation, the ALJ found that the plaintiff was "capable of performing past relevant work as a pastor" (Tr. 20, 32).

"Past relevant work" is defined by the regulations as "work that you have done within the past 15 years, *that was substantial gainful activity*, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1) (emphasis added). Thus, by definition, work that was not substantial gainful activity cannot also be past relevant work. The ALJ noted this definition in his decision (Tr. 14, 26), but went on to make the inconsistent findings described above. Accordingly, upon remand, the ALJ should be directed to reconsider his finding at step four of the sequential evaluation process in accordance with the foregoing.

## Other Work

The plaintiff further argues that the ALJ erred at step five of the sequential evaluation process by failing to establish "other work" that he could perform. The

14

Commissioner argues that any error the ALJ made in finding that the plaintiff could perform his past relevant work as a pastor was harmless because the ALJ made an alternate step five finding.

The ALJ found as follows after finding the plaintiff could perform his past relevant work as a pastor: "In addition, considering the claimant's age, education, work experience, and the residual functional capacity found herein, Rule 203.12 would direct a conclusion of 'not disabled'" . . . (Tr. 20, 32). The plaintiff notes that the ALJ failed to ask the vocational expert any questions regarding whether other jobs existed at the medium level of exertion that the plaintiff could perform. Alternatively, the plaintiff argues that even if it was appropriate to apply the Medical-Vocational Guidelines ("the Grids") at step five, substantial evidence does not support a finding that he could perform medium work. Given the plaintiff's age, limited education, and lack of transferrable skills based on his past relevant work as an insulator (Tr. 86), at a sedentary level of exertion, Rule 201.01 would direct a finding of disability, as would Rule 202.01 at the light level of exertion. 20 C.F.R. pt. 404, subpt. P, app. 2, §§ 201.01, 202.01. As set forth above, this court recommends that the decision be remanded for further consideration of the treating physicians' opinions that the plaintiff could only perform work at these lower levels of exertion. Accordingly, upon remand and further consideration of those opinions and the plaintiff's RFC, the ALJ should also be instructed to make new findings at step five.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

                                                s/Kevin F. McDonald
                                                United States Magistrate Judge

December 15, 2011
Greenville, South Carolina